Good morning Your Honor, I'm really excited about the outcome of the plaintiff's appellate's case appeal. They're all here in person. I'd like to reserve two minutes for them. Today, this court is asked to determine what protections are afforded inmates when they're at greater risk of contracting a potentially deadly disease. First of all, the lower courts order a plaintiff's rejectment. It's ordered for the following four reasons. First, belly fever is a dangerous condition. It gives rise to the duty to warn and to protect. Second, unrelenting duty to protect inmates against COXI includes development of a COXI prevention policy and the implementation of preventative measures. Third, the district will assume the function of an attorney when it's determined as a matter of law that breach of the ordinary standard of care does not happen. And fourth, the district court failed to draw reasonable inferences in favor of the jury. I'm sorry, in favor of the jury. Can we go back to what the district court actually did? The district court, I think, said, I'm going to grant a summary judgment because the evidence shows that the infection rate, there's no evidence that shows that the infection rate at the prison was any different than the infection rate in the general area. I know you attacked that finding. Let's assume that that finding is supported by the record. And that's the only basis on which the district court granted a summary judgment. It didn't get into whether or not, if there's a duty you've fulfilled and all the other things that are right in the brief. Am I right in thinking that it granted a summary judgment solely because it concluded that the infection rates, there was no evidence that the infection rates at the prison were different than in Kerr County? I would say that for that particular finding, however, the court did say that because the environmental mitigation measures or preventative measures generally are not required or they haven't been found to be effective, that in order to show that the actions of MTC fell below the standard of care, you're looking at page 12, that absence of any consensus, legal or otherwise, as to the environmental mitigations that are effective and economically reasonable for mitigation. Yes, I wanted to get to that point. So let's assume the judge was right that there was no difference in infection rates. Don't spend time for the moment. What did the judge also say? I'm not clear. Would you have it show a breach of the duty if one existed? Right, so the court skipped to breach for... Right, so assuming there's a duty. Assuming that there is a duty. And breach can only be found if it's undisputed, right? The facts are undisputed. And here, the facts are not undisputed. So that's a focus on that. Tell me how you created a factual issue on the breach. The way we created a factual issue is, first, let me address the rate of infection. No, that's fine. I'm asking the same, but the rate of infection. Sure. The prison is exactly the same as the rate of infection, correct? Sure. So I have to address duty in the sense of there is a duty to protect them. Assuming you have that. Assuming a duty. Okay. So what exactly did MTC do to satisfy that duty? Well, in order to do that, they needed to develop a COGSI prevention policy, as found in Edison. None was developed here. And they needed to protect inmates. How do you do that? You protect them by implementing measures that are known to lower the risk. Because that is what the court in Edison said. You have to protect them against the risk of COGSI. That is a heightened duty under the special jailer-inmate relationship. So how do you protect them? Well, you have to do things that you yourself say lowers the risk. In fact, there is a document that MTC created, and it is found at 422 of the Joint Amendments. And in it, they say, here are the keys to prevention. They say, you should water the grass. You should plant cement. I don't know how else you plant cement. You lay cement. You wear masks. You avoid being outside when it's windy. These are things that should have been done and should have been implemented. Failing to do that is a breach of your duty, is a breach of your duty to protect the inmates. Evidence of a breach. Evidence of a breach, yes, Your Honor. So that is how we establish them. In addition, we had experts who provided affidavits who stated that these are effective measures that are used to protect against the risk of COGSI. And when there is a duty to protect against the risk of COGSI, you have to do certain things. You can't just sit back and say, well, as long as we don't hit that certain mark, we're good to go. You have to do certain things. You have to take certain actions. And under this record, in this record, there's at least a disputed fact as to whether or not MTC did that. And that is why the court could not determine as a matter of law that MTC did not breach its duty. With regard to the argument that one of the mitigation measures might have been construction, haven't we foreclosed that argument? We do not disagree that under the contract between MTC and the BOP, that additions and modifications to structural buildings are within the purview of the BOP. We do not disagree with that. However, what we are saying is that there are other effective mitigation measures, preventative measures, that MTC could have done, given their contractual obligations, given their duty under the jailer-inmate relationship. That is not excluded by the contract with the BOP. Does the MTC argument that they have a duty solely under the jailer-inmate relationship? I'm sorry, I didn't say it properly. Or do they also have a duty simply as the owner or occupier of the property? Both, Your Honor. Only apart from the BOP's duty. Correct. As possessor of the land, as having control over the land, as having supervisory power over what happens at TCI, they, too, have that duty. That second duty is only a duty to the board, is it not? Well, we think it's in combination. You know, if there's a dangerous condition on the land and you are the jailer, right? Right. That's why I'm trying to separate the two. Okay. The jailer relationship, I would say an owner of the people and their control, but as an owner or occupier of land, it's only your duty to ward against dangers, is it not? No, I would say that it extends to a duty, because the umbrella duty is the duty to protect inmates against foreseeable harm. And here, back to the inmates, though, I thought your question was just about the owner of land. So let's say you have a grocery store. Right. And you're the operator of the grocery store, and your customers, you don't have that kind of special care. So what is it that the owner of the land has to do to acquire an owner? If the owner of that particular grocery store happens to sit on a, basically, in a dust bowl, which is what TCI is, then they have people coming in, and they know that. Don't they just have a duty to put up a sign? That was my question. Don't they just have a duty to ward? Let's assume it's a hotel. Yes. So the hotel would be in Kerntown, and you advertise, and you say, come and stay at my hotel. By the way, where are dust bowls used? You should probably have a duty to ward if there's a risk of contamination. Yes, I guess in those sort of cases, isn't then the hotel guest can exercise a freedom of choice decision? With respect to the occupier duty, what evidence was there of breach of the duty to ward? The evidence of breach in the case of MTC is that a warning must enable those at risk to mitigate or avoid the risk. So it's inseparable in your ear from the jailer? Not entirely, because MTC, I imagine, Ms. Herbert will get up here in a moment and say, well, we did all these things. We provided pamphlets. We provided an education and admissions orientation. And then we warned her. I'm making her argument for her. But where there's a problem with what MTC did is it doesn't enable the particular person at risk, and here it is, the inmate, because we have to take that into consideration. It didn't enable the inmate to protect himself. If you look at the... Leslie, that's why I'm having some difficulty separating the two. It seems to me that I don't want to make your point as very misguided, but you might well argue that we warned quite extensively. And your answer to that is you may have warned, but they were inmates. What could they do? You warned them that they might get Valley fever, but they couldn't protect themselves against it. That has to do with the inmate relationship. Even the warning itself is a disputed fact. If you look at the record, you'll see that while MTC may claim to have provided information, admissions, and orientation, and while they may have claimed to have provided pamphlets, do things still recall that in fact? That's not a dispute. Not recalling is not a disputed fact. It happens a lot, not just in this case. But if I say the light was green, and you say, I don't remember what color the light was, that's not a disputed fact. But we do have inmates who say, were you told about Valley fever at admissions and orientation? And one of them did say no. So, but I do think that the warning is important, and I know there obviously we have the responsibility of the BOP in this case, but I think the MTC has a separate duty in and of itself to warn inmates. I agree that they have a duty. My question is really whether or not there's any evidence in this case of breach of that duty. Given that they've provided fairly extensive information about the warnings they gave, so the question is, when we look at those warnings, can we think that there's a material question about breach of the duty to warn? There may well be breach of the duty that arises from being in jail or to protect. Is there, what's the evidence of breach of the duty to warn? Well, I believe that if you look at the duty to warn as being, that needs to be adequate in order for someone to avoid the risk or mitigate the risk, right? A duty to warn just to say, hey, there's a hole on that part of the, or there's a hole over there, don't fall into it without telling them where the hole is. That doesn't enable the person to avoid the risk. And here telling prisoners that you avoid the risk by avoiding the infected area entirely doesn't exactly help to mitigate the risk when they're already at TCI, they're already facing the risk. And then telling them dust control helps mitigate the risk. And these inmates have no power to... Focus on the warning again. Certainly. What would an adequate warning be in your view? The warning that would have been adequate in this case is informing them, look, you need to make sure that you keep your hands clean when you get dust on them. You want to make sure you truly avoid the dust. You want to make sure that you're going to avoid being in windy conditions. When you are doing work, you always want to wear a mask. And obviously the effectiveness of the masks are also in dispute in this case. But you have to give the inmates enough information and enough warning so that day, as inmates, can avoid that risk. And that's in dispute in this case. You have down to about two and a half minutes. Did you wish to reserve some rebuttal time? Yes, Your Honor. I did want to reserve two minutes for rebuttal. But on the other measures, or on the other issues in this case, it's clear to at least plaintiffs that the proper standard in this case was a reasonable person standard. And by simply saying that the plaintiffs did not establish that NTC is required to do these effective measures, that that's not the applicable standard in this case. It's distinguishable from Ramirez. And given the facts of this case, given NTC's own documents about what is effective, given what the plaintiffs have provided through their experts, it was an issue for the jury to decide. And finally, I will reiterate that there are numerous inferences that should have been drawn in favor of the plaintiffs, but the court decided to draw them in favor of the majority NTC. And with that, I will conclude my time for the moment. Thank you. All Your Honor, two minutes have already been made. Thank you, Your Honor. Thank you. Good morning. May it please the Court, my name is Christina Dunn-Gernberg, and I represent Appellee Management and Training Corporation. The heart of plaintiff's argument is that NTC, a third-party operator of TAF Correctional Institution, should have had an affirmative duty to make TAF safer from belly fever than the surrounding community. Specifically, they allege that NTC failed to implement environmental mitigation measures that no other prison or business was required to adopt. Now, let's focus on Kern County for a second. Is it your position that because the prison was no more dangerous than Kern County as a whole, that you've reached no duty? Defendant's position is that because there's no evidence that the prison was any more dangerous with respect to belly fever than the surrounding area in Kern County, that there was therefore no breach of duty. Correct, because there was no dangerous condition. That's clear. That's why I'm having some great difficulty with it in district courts. You may have went otherwise, but I don't know why that matters. These folks were folks who said, hey, I'd like to go to Kern County. There were folks that the Bureau of Prisons said you must go to Kern County, and they arrived in an area where there were dangerous conditions. And there's plenty of evidence in this record that those conditions can be mitigated in some ways. You don't dispute that. So given that, why doesn't the prison operator have some duty to these inmates, even if it's no worse there than it is outside the prison walls? I think the context of the prison being within Kern County is important because this is an environmental, naturally occurring phenomenon that's impossible to eradicate. Well, nobody believes you can eradicate it, but you don't dispute that there's plenty of evidence in this record that one can mitigate the dangers. There are some mitigation measures, but there's no consensus that the environmental mitigation measures were effective. Well, but that's a separate issue of whether or not you have a duty to the inmates. Because you're arguing you didn't breach the duty. But surely you have a duty to the inmates to undertake reasonable steps to protect them, don't you? There is the relationship between the jailer and the inmates. MTC acknowledges that. And while plaintiffs came up and they started their argument by saying that MTC had a duty to implement a COXI prevention policy and failed to do that, that's actually inaccurate. It's undisputed that MTC created Standard Operating Procedure 4002, which specifically dealt with screening inmates to prevent them from coming to the institution if they had certain immunocompromised conditions, if they were receiving chemotherapy. Sure, but the record's clear. Since I live in Arizona, I kind of know this. You can get valley fever if you don't have a compromised immune system, correct? Correct. So they put out a bunch of experts that say you could have done better. You had a duty to these folks, and a reasonable thing to do would have been a whole variety of things. You didn't do those things. So why does that raise that question? I think because the legal standard is whether there is an unreasonable risk. And that is what the court applied a decision for. And it specifically said that it's important to note the decision of the receiver to impose or not impose additional mitigation strategies to minimize the rate of COXI is primarily driven to the extent which the incidence of COXI at a particular prison exceeds infection in a community. Let me ask you about that question. Just stepping back theoretically for a moment, is it possible for a jury to find your client liable on a negligence hearing even if the rates of infection are approximately the same as those in the surrounding community? MTC's position is that it's not, because the court, contrary to how I just characterized it, MTC's position is not that the court found a breach. Rather, they looked at the contours of what the standard of care is for a prison. I think this happens all the time. I guess the reason I'm asking the question is, I'm going to wait to ask you one I don't have to show. Well, there are really two questions. One is whether it's a jury question, whether the rates are the same or similar, because they fluctuate sometimes higher, sometimes lower. But the theoretical question is this. Would it be permissible for a jury to find that even though the rates are the same, they could have been lower, and therefore there was still a duty that was breached to make them as low as possible? I'm not stating that very well, but they are captive, literally. They can't go somewhere else, and they can't plant grass on their own, and they can't do some of these other things that have been talked about. So is that a viable theory? I don't believe that's a viable theory, because that is creating a higher standard that the prison needs than what is a basic negligence standard. Let's go back. Let's make a smallpox. Let's assume that there's a smallpox outbreak in the community, and there's an equal level of smallpox in the prison, and nobody in the community goes out and gets this information. They're too poor. They're badly advised. Does that mean you have no duty to give smallpox shots to inmates because they're not suffering any worse than the people in the area around them? I don't believe that there is a duty to do what the outside community is not required to do. Really, so you've got these captive inmates there. You can protect them against smallpox simply by inoculating them. You're saying, hey, you're no worse off than the idiots outside, who refuse to even have a cure. Is that true? Smallpox is a good example, and the flu is also another example. Well, flu is a great example. Let's assume you have a flu outbreak in the community, and you have the ability at hand to inoculate inmates against the flu. Do you have to say, well, I have no duty to do so because everybody in the community has flu, so if you're an inmate, why do you want to be better off than anybody in the community? I think there's a duty to do some things. However, there's not a duty to do something that no one else is required or even suggesting is effective to do. That's a separate issue. We're talking about duty now. We're not talking about breach. Don't you have a duty of care to these inmates to protect them, if you can reasonably do so, against valley fever? Yes, which is what they did with a standard operating procedure. Okay. And that duty exists even if their risk of valley fever is no greater than the risk that another resident of Kern County might have? I think the proportion of the outside community to the prison itself informs the contours of the valley. No, that may inform what's reasonable to do. My question is, don't you have a duty to them, without regard to the rate of valley fever in the rest of the community? If there's a risk that they will contract valley fever by putting in your facility, don't you have a duty to take reasonable measures to protect them against that, without regard to whether the gross crime would be warranted against the community? Yes, there is a general duty to take reasonable measures. However, there's no evidence that these environmental measures were reasonable, and the court's interplay of the rates and levels and environmental put together is showing that there's no way that there could be a breach of duty here. Okay. So on that point, the court's conclusion could be correct as a matter of fact, but didn't they have experts who said that there are measures that you could have taken that would have reduced the incidence of valley fever among the inmates? Their expert listed several things that were available. However, there was nothing specifically that said that these would have lowered the rate for the prison population to a reasonable extent, and there was no example of any other prisons, no other businesses that implemented these measures, simply saying that an expert could say, if you build a bubble over the prison, that will reduce. But the expert said stuff like, you know, make sure they wash their hands, and it's not building a bubble. Make sure that you don't put a condom on them. Is the unreasonableness of the risk of harm a jury question? No. And that is because of the contours of this specific case, which is you have an environmental condition, and you're asking a facility within a community where something is endemic to impose measures that are beyond what is acceptable either for any prison, let alone the community. So what do you do with Edison? Edison? We believe that there's no conflict with our position and the findings of Edison. If anything, this supports MTC's position that it did not have requisite control of the facility. I believe the finding at Edison was that. Let me just see. Edison says that there's a cause of action against the DOJ for not doing the kinds of things that DOJs have been doing. So given that, it's hard for me to think that there can't be a duty or a breach of duty. You must be arguing something different. Well, in the Edison case, when it was up at the Ninth Circuit, it was just at the motion-to-dismiss stage. So at that stage, they had to accept all plaintiff's allegations as true. There wasn't an opportunity for the USA or for MTC at that point to dispute the levels and whether there was a dangerous condition. I think at Edison, the Ninth Circuit had to jump in to the point where there's just a basic assumption that there was an unreasonable condition. They didn't have the opportunity to look at evidence because it was a motion-to-dismiss stage. The Ninth Circuit did say the risk of contracting out-of-fever. I don't want to use the other term because I'll always screw it up. The risk of contracting out-of-fever is an excessive risk of which prisoners should be protected against. They did say that. They didn't need. That wasn't something that needed evidence on because the government said we don't have to tell them it's not a big deal. And the court said, no, no, that's the kind of risk that people want to be protected against. Whether or not they took reasonable measures is a separate issue. They said that based on the allegations. And the only evidence that was at issue in Edison is whether BOP retained control of the premises. And the ultimate finding in Edison was that BOP retained exclusive right to construct new buildings and exclusive right to make modifications to existing buildings. There's nothing. Plaintiffs haven't offered any evidence that any of the environmental mitigation measures that they claim that MTC should have implemented were within the control of MTC. With the structural stuff aside, don't you have the ability to do stuff like not send them out to work during the midsummer? Right. And there was evidence that inmates were not permitted to go outside when it was windy. It's undisputed that the inmates testified. But that's a different argument than what you just made. You said there's no measures that were within our control of MTC. Now you're saying we took all the measures that were within our control. Well, I guess it's been kind of unclear exactly what all the environmental mitigation measures are. And when I say environmental mitigation measures, I am thinking of the structural changes, which do include things like watering the grass, paving the sidewalks, exposing the walkways, structural changes, even changes to the HVAC system. As an operator of the prison, those were outside the bounds of. . . Watering the grass. Yes. Outside your bounds. Yes. And MTC provided evidence in its motion for summary judgment that it had to ask the BOP for permission for things about the watering policy. And even when things like watering the grass was discussed in 2009, BOP said no. They couldn't change the watering schedule. Those were things that MTC did not have control of. With respect to the warnings, if the court would like me to address that, I do think that that record does show that MTC gave warnings. Yeah, the only question I have about that is that one of the affidavits, I think it might have been Harmony on Affidavit, said that the warnings were inadequate. And he says, they're like, illusory, but does that create an issue? That was the plaintiff's expert? Is that correct? Yeah. Yes. You don't have any of the plaintiffs in this case ever saying that any of their warnings were inadequate. Even the citation to LaGoya's deposition, where they're trying to create a materials dispute as to the adequacy of the warnings, actually did show that he did appreciate that he knew that COX-E existed. If anything, he thought it was worse than it was. He knew that it was a lung infection. He knew that other prisoners were talking about it. That shows that MTC was warning people. And whether inmates wanted to try to transfer institutions, that was outside of the control also of MTC. The transfers outside of the standard operating procedure 4002, all other transfers were within the purview of BOP. Unless there's any other questions, we'll submit on the record. I think we don't have any further questions for you. Thank you. Thank you, Your Honors. Ms. Chen, you did say hello. We're out of time. Thank you, Your Honor. I'd like to address a couple points that Ms. Weber made. Specifically, I'd like to start with, what are the responsibilities that were delegated to MTC? And if you look at their contract, it's clear. MTC was responsible for housing inmates in a safe, secure, and humane manner. All the things that are incumbent with that, that was their responsibility. MTC shall provide appropriate safety, protective clothing, and equipment wear. That's masks. Those are things that are within MTC's responsibilities. For them to say, well, we couldn't do this, we couldn't do that. First of all, there's really no evidence of that. They asked, yes, I'm not going to disagree with that. They did ask about water and watering at one point. What was said by BOP said, well, we said you don't water within 20 feet of the buildings. And it's admitted by MTC that in those meeting minutes, the warden went beyond that. He went beyond just water within 20 feet. So I think it's disputed as to whether or not MTC breached his duty. Okay. I want to ask you a question about Anderson. Is it the last? Okay, go ahead, Anderson. The report says the BOP also explicitly excluded its contractors from participating in the development of a COSI prevention policy. And this is the same contractor. If the BOP excluded them from the ability to develop a policy, how could they develop a policy? The email that was relied upon for that particular finding was an email between the BOP and CDC where the BOP said, contact us about when you want to visit the prison. The reason why this is still a dispute as to whether or not MTC could have developed a policy or should have developed a policy is that there's no evidence in the record that BOP said to MTC don't develop a policy. There's absolutely no evidence of that. The fact that the BOP and the CDC may have been discussing amongst themselves is one issue. The district court didn't base its conclusion. It did not. I was just interested in your position. That's not in the record in this case. Well, I would say that that email is in the record, but there's no evidence that the BOP said to MTC that you are excluded. Don't do this. We have it. Would that be a defense for MTC if the BOP said, we don't want you to develop a COSI prevention policy? Within the scope of the larger umbrella of the specific duty to develop, if BOP said, don't do it? Don't do it. We don't want one. I would have to agree, yes. Thank you, counsel. The case just started in September, and we appreciate very much the helpful arguments from both counsel. We are adjourned for this morning's session. Thank you.
judges: Graber, Hurwitz, Foote